IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 3, 2015 Session

## STATE OF TENNESSEE v. JERRY EDWARD LANIER

**Direct Appeal from the Circuit Court for Dyer County**
**No. 11-CR-443      Russell Lee Moore, Jr., Judge**

_____

**No. W2014-01840-CCA-R3-CD  - Filed May 27, 2015**

_____

A Dyer County jury convicted the Defendant, Jerry Edward Lanier, of two counts of selling more than .5 gram of cocaine in a drug-free zone. Following a sentencing hearing, the trial court ordered the Defendant to serve concurrent thirty-year sentences for his convictions. On appeal, the Defendant challenges the sufficiency of the evidence against him. After a thorough review of the record and the applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellant, Jerry Edward Lanier.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; C. Phillip Bivens, District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from two drug transactions that occurred within one thousand feet of Scott Street Park in Dyer County, Tennessee, between the Defendant and a confidential informant working with the police. A Dyer County grand jury indicted the Defendant for two counts of sale of a Schedule II drug in a drug-free zone. At the Defendant's trial on these charges, the parties presented the following evidence: Mike Leggett, a Dyersburg Police Department officer, testified that he was involved in a controlled buy on July 1, 2011, in

Dyersburg. Sergeant Leggett stated that the drug buy occurred at a residence located on Scott Street, which is located near Scott Street Park.

Sergeant Leggett testified that, due to the "relatively small" population of Dyersburg, the narcotics unit often used confidential informants because police officers are easily recognized. He confirmed that a confidential informant was used in this controlled buy. Sergeant Leggett said that the Confidential Informant ("CI") and the CI's vehicle were searched prior to the buy. An electronic transmitter used to monitor the buy in real time as well as record the transaction was placed on the CI's body, and the CI was provided $50 for the drug purchase. The serial numbers from the bills given to the CI had been recorded by the police. Sergeant Leggett recalled that when he first met with the CI on July 1, 2011, he asked the CI, "Who can you buy from?" Using a number in his cell phone, the CI made contact with the Defendant and arranged to meet at the CI's residence.

Sergeant Leggett testified that police officers monitored the CI's exchange with the Defendant from "around the corner by the park," because the CI had informed the officers that the Defendant was "very suspicious and aware of his surroundings." Following the exchange, the CI and the police officers met at a predetermined location where the cocaine was collected and the CI and his vehicle were again searched.

On cross-examination, Sergeant Leggett explained that he did not determine the location of the buy. The location was selected during the phone conversation between the CI and the Defendant. Sergeant Leggett stated, "That's where [the CI] was instructed to meet."

Chris Clements, a Dyersburg Police Department officer, testified that he worked with Sergeant Leggett on the July 1, 2011, controlled drug buy. He stated that he searched the CI's person, clothing, and vehicle to ensure that the CI did not have any contraband before the drug buy commenced. Sergeant Clements recalled that the buy occurred on Scott Street near a public park, Scott Street Park. After the transaction, the officers again met with the CI. Sergeant Leggett collected the drugs, and Sergeant Clements searched the CI and his vehicle, finding no evidence of contraband.

Sergeant Clements testified that he worked with the same CI on a drug buy from the Defendant on July 5, 2011. Sergeant Clements followed the same procedure as used for the July 1, 2011 controlled buy. He recalled that the CI called the Defendant and the two arranged to meet at the Scott Street residence. Immediately after the transaction, Sergeant Clements met with the CI and collected the purchased cocaine.

On cross-examination, Sergeant Clements testified that the CI was instructed to

2

remain in his vehicle and not enter the residence during the transactions. Sergeant Clements agreed that, during the July 1, 2011, transaction, the CI did get out of his vehicle and sit on the front porch of the Scott Street residence for approximately seven minutes. He stated that the CI asked the police officers for permission before doing so.

Mason McDowell, a Dyersburg Police Department officer, testified that he worked with Sergeant Clements during the July 5, 2011, controlled drug buy involving the Defendant. Officer McDowell recalled that, before the controlled buy, Sergeant Clements searched the CI while he oversaw the technical equipment used to monitor and record the transaction. Officer McDowell also provided the CI with $50 of recorded money for the purchase. He stated that the CI advised the officers that he could purchase drugs from someone the CI referred to as "Slim." Officer McDowell knew "Slim" to be the Defendant, and the CI confirmed with Officer McDowell that the person he referred to as "Slim" was the Defendant.

The State played the video recording of the July 5, 2011 transaction, and Officer McDowell identified the CI's residence on Scott Street where the transaction occurred and the Defendant's vehicle, a Ford Thunderbird, arriving in the driveway. Officer McDowell identified the Defendant as the person operating the Thunderbird. He also identified a white baggie being exchanged between the CI and the Defendant as consistent with the package the CI returned to the officers immediately following the transaction. Officer McDowell testified that U.S. currency appeared to be transferred between the men.

Officer McDowell testified that, directly after the drug buy, he met with the CI again and collected the crack cocaine that the CI had purchased from the Defendant while Sergeant Clements conducted a search of the CI and the CI's vehicle.

On cross-examination Officer McDowell testified that the recorded money used during the transaction was never recovered. Officer McDowell said that, although the money was never recovered, he did provide the CI with $50, the video depicts the CI giving the Defendant cash, and the CI did not return with any money.

Carmen Cupples, Information Technology and Geographic Information System manager for the City of Dyersburg, identified a map her office had generated showing the distance in feet between the Scott Street residence and Scott Street Park. Ms. Cupples noted that the distance between the Scott Street residence and Scott Street Park was 165 feet. She said the distance was accurate within two to three feet.

On cross-examination, Ms. Cupples agreed that the measurement was not to the entrance of the park. Ms. Cupples stated that she did not have any information showing that

3

the Scott Street Park "was actually adopted as a park" by the City of Dyersburg. She stated, however, that the software used to generate the map indicated that the property was owned by the City of Dyersburg.

The CI testified that he worked as a confidential informant for the Dyersburg Police Department from June 2011 to October 2011. He admitted that he had prior criminal convictions, and the most recent conviction occurred in 1999. The CI agreed that he met with police officers before each of the controlled buys from the Defendant on July 1 and July 5, 2011. The CI stated that the police officers provided him with money for the purchases and fitted him with audio and video transmitters to monitor and record the buys. He confirmed that he bought the cocaine from the same person, the Defendant, on both occasions.

The CI testified that he had known the Defendant "all [his] life" and knew both his nickname, "Slim," and his legal name. The CI stated that he called the Defendant on July 1, 2011, and inquired whether the Defendant was selling powder cocaine. He explained to the Defendant that he intended to resell the cocaine to another buyer in an attempt to appear "more believable." The Defendant agreed to sell the CI one gram of cocaine for $50. The Defendant arrived at the CI's residence on Scott Street driving a Thunderbird. The CI said the transaction was quick, approximately thirty seconds, in order to avoid detection. The CI stated that he gave the Defendant the $50 buy money that the police officers had given him in exchange for cocaine.

The State played the video recording of the transaction and the CI narrated as the events occurred. The CI described the transaction as a "typical" drug deal. The CI stated that, following the transaction, he drove directly to where he was to meet with the officers. Once there, he handed over the cocaine to the officers.

The CI testified that he purchased cocaine from the Defendant again on July 5, 2011, as part of a controlled buy. He stated that the procedures for preparing him for the buy were consistent with the procedures used on July 1. The CI said that he once again called the Defendant and asked to buy one gram of cocaine. The Defendant confirmed that he had cocaine and agreed to sell one gram to the CI. When asked how the CI knew where to meet the Defendant for the buy, the CI responded, "it's the same spot we usually meet at. I always meet in the same spot." The CI said that he waited almost an hour for the Defendant to arrive. He recalled that the Defendant was circling the area trying to spot any police officers before conducting the sale. This time the Defendant's girlfriend was with the Defendant although she did not participate in the buy. The CI recalled that he handed the Defendant the $50 provided to him by the police, and the Defendant gave the CI cocaine. The CI stated that he gave Officer McDowell the cocaine that the Defendant had given him in exchange for the

$50.

On cross-examination, the CI agreed that he had asked the Defendant for powder cocaine for the July 1, 2011 transaction but that the Defendant brought him crack cocaine. The CI said that he did not "check" to see if he received what he had requested, he merely turned it over to the officers.

Brock Sain, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified as an expert in the field of drug identification. Special Agent Sain stated that he analyzed the substance submitted from the July 1, 2011 controlled buy and concluded that the substance was 1.06 grams of crack cocaine.

Shalandus Garrett, a TBI forensic scientist, testified as an expert in the field of drug identification. Special Agent Garrett stated that she analyzed the substance submitted from the July 5, 2011 controlled buy and the substance tested positive for cocaine and weighed .66 of a gram. She stated that both cocaine and crack cocaine are Schedule II controlled substances.

Based upon this evidence, the jury convicted the Defendant of two counts of sale of over .5 gram of a Schedule II controlled substance within a thousand feet of a public park. Following a sentencing hearing, the trial court ordered the Defendant to serve concurrent thirty-year sentences. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. Specifically he contends that: (1) the proof at trial was contradictory and unreliable; (2) the State failed to establish that the Defendant knew the park was within 1,000 feet of where the drug transaction took place; and (3) the State failed to establish that the location of the drug transaction was within 1,000 feet of the park. The State responds that the proof showed that the Defendant sold more than .5 gram of cocaine to an undercover agent of the Dyersburg Police Department within 1,000 feet of a public park on two occasions. As to the Defendant's contention that the State must prove a mental state with respect to the Defendant's knowledge of the park, the State asserts that the "knowing" element of the Drug Control Act does not apply to the Drug-Free Zone Act. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate

inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Tennessee Code Annotated provides that it is an offense for a person to knowingly sell a controlled substance. T.C.A. § 39-17-417(a)(3) (2014). Cocaine is a Schedule II controlled substance. T.C.A. § 39-17-408. "Knowingly" is defined as when a person acts "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). "A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park" results in enhanced punishment. T.C.A. § 39-17-432(b)(1). Further, "[a] person convicted of violating this subsection (b), who is within the prohibited zone of a preschool, childcare center, public library, recreational center or park shall not be subject to additional incarceration as a result of this subsection (b) but shall be subject to the additional fines imposed by this section." T.C.A. § 39-17-432(b)(3).

The evidence, considered in the light most favorable to the State, proves beyond a reasonable doubt that, on two occasions, the Defendant knowingly sold over .5 gram of a Schedule II controlled substance to a confidential informant. The evidence, considered in the light most favorable to the State, also proves beyond a reasonable doubt that on the same two occasions the controlled substance sales occurred within 1,000 feet of real property that comprises a public park in Dyersburg. The Defendant and the CI had telephone conversations on July 1, 2011, and July 5, 2011, during which the CI indicated he wanted to buy one gram of cocaine. The Defendant set the price at $50 and agreed to meet the CI at the Scott Street residence to sell the cocaine to the CI. Once there, the Defendant took the CI's money and, on July 1, 2011, provided the CI with 1.06 grams of crack cocaine, and, on July 5, 2011, provided the CI with .66 gram of powder cocaine. The substances were later confirmed to be crack cocaine and powder cocaine, both Schedule II controlled substances. An employee of the City of Dyersburg testified that the Scott Street residence, the location where the sale took place, was within 1,000 feet of Scott Street Park. Specifically, the location of the transaction was approximately 165 feet from the park. This is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of the offenses for which he was convicted.

7

Any challenge the Defendant raises with respect to the reliability of the testimony at trial was resolved by the trier of fact. As we earlier stated, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The Defendant thoroughly cross-examined the CI at trial and the jury heard about the CI's criminal history and the procedures conducted by the police in preparation for the controlled buy. The jury, by its verdict, found the CI's account of the transactions more credible than the Defendant's theory of the case.

The Defendant also argues that the State failed to prove any mental state with respect to his knowledge of the existence of the alleged park, thereby requiring reversal of his convictions. The Drug-Free Zone Act, however, is a sentence enhancement that does not include a *mens rea* element. *See* T.C.A. § 39-17-432(b)(1). This Court has previously held that the legislature's intent to enact an "enhancement statute" is unmistakable both from the plain language of Act and from the Act's legislative history. *State v. Smith*, 48 S.W.3d 159, 167 (Tenn. Crim. App. 2000). Therefore, the State was not required to prove a *mens rea* to enhance penalties for violations of the Drug-Free Zone Act.

Accordingly, we conclude that there is sufficient evidence to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of sale of more than .5 gram of a Schedule II controlled substance within 1,000 feet of a public park on two separate occasions. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

8